## Case No. 16,146.

### UNITED STATES v. REITER.
### UNITED STATES v. LOUIS.

[4 Am. Law Reg. (N. S.) 534.]

Provisional Court,[1] State of Louisiana. July, 1865.

**WAR—BELLIGERENT OCCUPATION—AUTHORITY OF PRESIDENT.**

1. At the time of the establishment of the provisional court for Louisiana, a considerable part of the territory of that state was held by the forces of the United States, in armed belligerent occupation.

2. In a country so held, the authority of the occupying force is paramount, and necessarily operates the exclusion of all other independent authority in it.

3. Government from some source is a necessity, and while the power to give and administer government is exclusively with a party occupying a country, there can be no doubt that the right and the duty are his to furnish a government and supply that want.

4. The establishment of the provisional court for Louisiana, by the president, as commander-in-chief of the forces of the United States, while they held the territory in which it was to exercise its functions, was an act warranted by the law of nations.

---

[1] [This court was established by an executive order of the president of the United States, October 20, 1862, a copy of which is given in the opinion of the court. See, also, The Grapeshot, 9 Wall. (76 U. S.) 129. The records of the provisional court were transferred to the district court by Act July 28, 1866 (14 Stat. 344, c. 310)].

5. So long as the authority of the United States shall continue, the right and the duty of it as the party dominant there to afford to the country a government will continue.

6. Said court has, from the time of its foundation to the present time, rightfully exercised its functions in territory in which the government of the United States has been by force of its arms sovereign, and will continue rightfully to exercise them there, so long as its commission shall remain unrevoked and the power of the United States shall continue to support it in the exercise of them.

The accused were tried before Judge Peabody and a jury, and were severally convicted; [Augustus] Reiter of murder, and [John] Louis of arson. After the convictions a motion was made in each case in arrest of judgment.

Mr. Whittaker, for Reiter.

Durant & Horne, for Louis.

Geo. D. Lamont, Pros. Atty., for the United States.

PEABODY, Provisional Judge. These two cases may without inconvenience or danger of confusion be considered together, although they have in fact no connection with each other. The same objection to the proceeding of the court to pronounce sentence upon the accused and in arrest of judgment, is made by both the defendants, and although the objection is urged on different grounds in the two cases, still the objection is proper to be considered on all the grounds in each case. It is urged that this court is not authorized to try these defendants, and that its proceedings have not the sanction of law in the premises. If for any reason this be the case, no further steps should be taken. If for any reason the authority is wanting in one case it is equally so in the other, and the court should refrain from going further in either case. The accused have been indicted separately and tried separately on charges wholly different and having no connection the one with the other, and the consideration of their cases together rather than separately, now, is a matter of convenience solely. One of the accused, Reiter, has been indicted for murder, in causing the death of his wife by violence. The other has been indicted for arson, in burning a building used as a mansion or dwelling-house. Each has been tried before a jury of this parish and been duly convicted of the offence charged in the indictment, and each is now before the court on a motion in arrest of judgment, and in each case the arrest is urged on the ground that the court is not authorized in law and has not jurisdiction to try the case. The counsel for Reiter claim that the court, in its constitution and creation, had not originally the warrant of law to try the accused. The counsel for Louis concede that the court had authority originally to entertain and try such a case, but insist that for causes occurring since, its authority has ceased; that certain steps taken in Louisiana toward the re-establishment of a civil state government have superseded the powers once possessed by the court, and that it is now without jurisdiction or power. The offences of which the defendants stand convicted, by the laws of Louisiana are punishable with death, and nothing would be more agreeable to the court than to proceed with the utmost caution in considering these objections to its jurisdiction. The accused have been indicted, tried, and convicted under and pursuant to the law of the state of Louisiana.

The first question to be considered is whether the court has ever had, from the nature of its origin and constitution, authority to try cases like these; and if this question shall be decided in the affirmative it will remain to examine.

The second question, namely, whether the power to try or the jurisdiction over such a case, once possessed by this court, has been withdrawn or lost,—whether the court in fact has been in any way deprived of it by subsequent events.

It must be conceded that the court, in its origin and structure, is quite out of the usual course and novel. It has not its origin or foundation in any constitutional or legislative enactment—is not the creature of any regularly-organized constitutional or legislative body. Ordinarily the judicial tribunals of the land are the creations of the legislative departments either of the state or federal government, and for the regularity of their creation and the character and extent of their powers depend on the action of the legislative branch of the one or the other of these powers. In such cases, the first thing to be done in ascertaining the legality or powers of a court, is to consult the constitution and legislation of the government from which it claims to hold commission, and in the letter of these is found the act of its creation and the extent and limit of its powers. Not so with this provisional court, which depends for its existence on the law of nations, and on that part of the law of nations relating to war—the law by which parties and neutrals are guided in their treatment of each other in a state of war; and that portion of it which relates to and determines the rights and duties of a belligerent, a conqueror in the territory of an enemy and holding it in armed occupation. On that law must depend the decision of the question presented by this motion, of the validity in law and the powers of this court. On that law alone must this court rely for the power and jurisdiction it has exercised for a considerable time, in a large number of cases involving amounts usually very large. It was in that law that the president of the United States, pressed by the urgent wants of the community here, found his warrant for the establishment of this court in the midst of the country of an enemy held by him jure belli in armed belligerent occupation.

The authority of this court is derived from the president of the United States, the chief executive of the nation and commander-in-chief of its forces military and naval. It is conferred by an order, of which the following is a copy: '

"Executive Order, Establishing a Provisional Court in Louisiana.

"Executive Mansion, Washington,
"October 20, 1862.

"The insurrection which has for some time prevailed in several of the states of this Union, including Louisiana, having temporarily subverted and swept away the civil institutions of that state, including the judiciary and the judicial authorities of the Union, so that it has become necessary to hold the state in military occupation; and it being indispensably necessary that there shall be some judicial tribunal existing there capable of administering justice, I have, therefore, thought it proper to appoint, and I do hereby constitute a provisional court, which shall be a court of record for the state of Louisiana, and I do hereby appoint Charles A. Peabody, of New York, to be provisional judge to hold said court, with authority to hear, try, and determine all causes, civil and criminal, including causes in law, equity, revenue, and admiralty, and particularly all such powers and jurisdiction as belong to the district and circuit courts of the United States, conforming his proceedings, so far as possible, to the course of proceedings and practice which has been customary in the courts of the United States and Louisiana, his judgment to be final and conclusive. And I do hereby authorize and empower the said judge to make and establish such rules and regulations as may be necessary for the exercise of his jurisdiction, and to appoint a prosecuting attorney, marshal, and clerk of the said court, who shall perform the functions of attorney, marshal, and clerk, according to such proceedings and practice as before mentioned, and such rules and regulations as may be made and established by said judge. These appointments are to continue during the pleasure of the president, not exceeding beyond the military occupation of the city of New Orleans, or the restoration of the civil authority in that city and in the state of Louisiana. These officers shall be paid, out of the contingent fund of the war department, compensation as follows: * * * Such compensations to be certified by the secretary of war. A copy of this order, certified by the secretary of war, and delivered to such judge, shall be deemed and held to be a sufficient commission. Let the seal of the United States be hereunto affixed.          Abraham Lincoln.
"By the President:
"William H. Seward, Secretary of State."

"War Department, Washington,
"23d October, 1862.

"I hereby certify that the foregoing is a true copy, duly examined and compared with the original of the executive order of the president of the United States, constituting a provisional court for the state of Louisiana.

"Witness my hand and the seal of the war department.
"Edwin M. Stanton, Secretary of War.
"Attest: John Potts, Chief Clerk."

This order, by its terms, no doubt embraces cases like these under consideration, as indeed it does, perhaps, all others which can occur in life, or become the subject of judicial investigation. The language of the order "to hear, try, and determine all causes, civil and criminal, including causes in law, equity, revenue, and admiralty," is clear and unquestionable, and embraces this class of cases, with all others of every description. The president then sought to give power to this court to try and determine cases of this kind, and having made an order to that effect, has given it that power, if he himself had authority to confer it. The only question remaining to be answered on this point, is whether the president had authority to confer such powers and jurisdiction.

The authority of the president of the United States to create this court, and invest it with powers which should embrace these cases, depends, to some extent at least, on the constitution of the United States, which creates the office exercised by him, and determines its functions. That constitution (article 2, § 1, par. 1) declares as follows: "The executive power shall be vested in a president of the United States of America." It also provides (article 2, § 2, par. 1): "The president shall be commander-in-chief of the army and navy of the United States, and of the militia of the several states when called into the actual service of the United States." As president, chief executive, and commander-in-chief of the army and navy, he would not ordinarily have power to establish tribunals for the determination of questions civil and criminal, arising in civil life. Was there anything in the condition of affairs existing at the time the order was made which could give him the power to establish them, and if so, what was there in the condition of affairs then existing to give him power in this respect not ordinarily possessed by him as one of the attributes of his office? Between the government of the United States and a people inhabiting a portion of country lying on the Atlantic Ocean and the Gulf of Mexico, and extending north beyond the northern boundary of the territory in question, and embracing within its borders that section of territory theretofore known, and still most conveniently designated, as the state of Louisiana, a war had for some time been waged. This fact is notorious, and moreover it is conclusively settled by the president, the ultimate arbiter of the fact, by his proclamation to that effect. As to its existence, therefore, as well as the existence of some other facts to which I shall have occasion to refer, equally well known,

no time will be consumed in attempting to prove them, but they will be assumed. It is a matter of public knowledge and notoriety that this war had been pending, and that the country over which the jurisdiction of this court is in question, and heretofore known, and in the order establishing this court described as the state of Louisiana, had been for many months held and occupied by those people and their forces, military and naval. That it had been for a long time previous to, and also since the commencement of this war, inhabited, cultivated, and owned by the same people who had entered into and carried on war with the government of the United States, and that it was still so inhabited by a people whose relations with the government of the United States had for some time been and were still those of enmity. That it had, in the course of the war, been by force of the arms of the United States wrested from the enemy, and was at the time the order establishing this court was made, held by the forces of the United States in armed belligerent occupation. That the armed belligerent forces of this enemy of the United States had been, by force of the arms of the United States, expelled from this country, and that they were at the time held out of it by the armed forces of the United States, and that war was still waged between those belligerents. The civil institutions of the country thus held, including the tribunals for the administration of justice, had been formed and established by the enemy of the conquering power, and were by it administered at the time of the conquest. These institutions having been formed, established, and administered by the government existing previous to and at the time of the conquest confessedly hostile to the government of the United States, were the only institutions found there at the time the military authority of the United States was by force of its arms established there.

By the conquest of the country, in this case as in others, the previously-existing government and the power by which it was administered were subverted and swept away, and those of the conquering power were substituted in their places. This is the necessary consequence of a conquest of a country —a transfer of the control, government, and sovereignty of it from one party to another. The old power is conquered and extinguished, and the new one of the conqueror is instituted in its place. The old institutions, if not abandoned and extinguished, are at least suspended in their action. They may be transferred to and adopted by the new governing power and may be used and operated by it, just as an old machine, detached from the power that has usually moved it, and abandoned for use as a whole, may furnish isolated pieces of machinery which can profitably be introduced into a new machine having different qualities, moved by a new and wholly another power, and used to accomplish on the whole, perhaps, purposes quite different. However there may be retained in use by the new governing power some of the features or institutions of the government which has been supplanted, it is nevertheless wholly another government, and derives its life and all its vital qualities from a new source—the new sovereignty installed by the conquest. A conquest necessarily operates the extinguishment of the power of the party conquered in the country which is the subject of conquest, and the establishment there of the power of the conqueror. Without this there is no conquest of a country, and there can be none. When the power previously dominant in a country has been extinguished by that of another party, and rendered incapable of governing it further, and a new one has been established in its stead, it is both the right and the duty of the party thus coming into power to see to it that a government wholesome and salutary shall be established and administered, and, as in such a case there is only one power, that of the new party succeeding, capable of giving and administering the government, it follows that it is the duty as well as the right of that power to do it. No country can exist without a government of some kind. The rights of the inhabitants must be protected—crime must be restrained and punished—the virtuous must be protected against the vicious—the weak against the strong—order must be preserved and security to person and estate assured. The party dominant for the time being has the power to do it, and no one else has the power, and it follows from the necessity of the case that he must exercise it. So the government of the United States, having conquered and expelled from the territory or country, theretofore known as the state of Louisiana, the power by which the government of it had been theretofore administered, and having established there its own power, was bound by the laws of war, as well as the dictates of humanity, to give to the territory thus bereft a government in the place and stead of the one deposed or overthrown, such an one as should reasonably secure the safety and welfare of the people thus reduced to subjection; in some manner, not inconsistent, to be sure, with the proper interests of the governing power, and the maintenance of it in its supremacy there. The power established there was the military power of the United States, and the president of the United States, as we have seen, the commander-in-chief of the forces, military and naval, of the United States, was at the head of that power, and had the right and duty to exercise and direct it. It was incumbent on him, representing for this purpose the sovereignty of the United States, to see that the duty devolving on his government should be properly performed. He acted in obedience to this duty, and in accordance with this right, when he attempted to establish there a judi-

cial tribunal capable of deciding controversies and administering justice.

But how does this question stand on the authority of adjudged cases? In the case of Cross v. Harrison, in the supreme court of the United States, in 1853, reported in 16 How. [57 U. S.] 164, the court held that a civil government formed in California, under the direction of the president of the United States, as commander-in-chief of the army and navy, shortly after the conquest of the country, and while it was held in military occupation by the forces under him, was an act warranted by the laws of nations, and that the formation of such a civil government was the rightful exercise of a belligerent right over a conquered country. It appeared that the port of San Francisco had been conquered by the arms of the United States in 1846, and that shortly afterwards, the United States holding military possession of all Upper California, the president authorized the commander of the forces of the United States there, to exercise the belligerent rights of a conqueror, and form a civil government for the conquered territory, with powers to impose duties on imports and tonnage, for the support of the government and of the army which held the country as a conquest in possession. This was done, and duties were levied and collected for a time. Afterwards, a treaty of peace was made with Mexico, by which Upper California was ceded to the United States. After this treaty, and after the cession to the United States of the territory, the military governor continued to collect import and tonnage duties as he had done before, but at the rate authorized by acts of congress in other parts of the United States; and for that purpose appointed the defendant in this suit collector there. He, as such collector, without any legislation of congress on the subject, collected those duties to a large amount from the plaintiffs, who sought in that suit to recover them back again. The question presented was, whether the United States, after the cession of this territory to it, and in the absence of any legislation by congress on the subject, had a right by its military governor to collect those duties. The governor, it appeared, collected them of his own motion, and without any instructions on the subject from his government at home. No question of the right of the government to levy duties as it pleased, while the country was held by right of conquest in strictly military occupation, appears to have been made; but the continuance of that right after the treaty of peace, and after the cession of the country to the United States, seems to have been chiefly in question. The court sustained the right in the broadest manner, putting their decision on the ground that the formation of the civil government when it was done, was the lawful exercise of a belligerent right over conquered territory. That that government being in existence when the territory was ceded to the United States, its powers did not cease by reason of the cession of the country to the United States, or of the restoration of peace, and that it was rightfully continued after peace was made with Mexico, until congress should legislate otherwise. The decision covered the whole ground that the duties were lawfuly collected by the civil military governor of California, an instrument of the provisional government of the United States in that country whilst the military occupation was continued; and that it was so afterwards from the ratification of the treaty of peace until the revenue system of the United States was put in practice, under acts of congress passed for that purpose; in effect deciding that the provisional government of the United States there was rightful and legal, and that it continued in force a legal rightful government through the time the country was held in military occupation, and after that occupation ceased, and that it was, in fact, in force until some other system was provided according to law to supersede it.

For the doctrine that a conqueror in a conquered country may establish a government and courts for the administration of justice, the case of Leitensdorfer v. Webb (decided by the supreme court of the United States, in 1857) 20 How. [61 U. S.] 176, is an authority directly in point. In that case the conduct of the government of the United States by General Kearney, the officer in command of its forces there, was brought in question. It appeared that after the conquest of that country by the arms of the United States, General Kearney, in command of the forces there, established a government and provisional courts for the administration of justice. Those courts, in the case referred to, were adjudged to be legal, and their decisions obligatory as warranted by law. The power to establish the government and the courts was directly in question, and was directly passed upon by the court, and was sustained on the ground of the right of conquest. In that case, moreover, it appeared that the country conquered was subsequently, by treaty, ceded to the United States, and it was claimed that by the act of cession the right of the United States to govern the country and enforce the laws made by the provisional government while it was held in military occupation, was terminated.

It was not seriously questioned that the United States might, while it held the country in military occupation, establish and administer a system of government—make laws by which to govern the inhabitants and regulate their rights and intercourse among themselves, and set up courts by which the laws so made should be administered. That right was deemed to be too evident to be seriously questioned. It was, however, in issue, and was necessarily passed upon by the court. The doctrine chiefly contended for,

was that by the cession of the country to the United States, the right to govern it by that provisional system adopted when it was held a conquest of arms, was terminated, and that the United States had, after the cession, only the right to govern it like other territory of the United States, by laws emanating from congress—the constitutional law-making power of its own government—enacted in reference to it as territory of the United States. This position was not sustained by the court, but was overruled and adjudged not warranted in law. The court says: "Of the validity of these ordinances of that provisional government there is made no question with respect to the period during which the territory was held by the United States as occupying conqueror, and it would seem to admit of no doubt, that during the period of their valid existence and operation, these ordinances must have displaced and superseded every previous institution of the vanquished or deposed political power which was incompatible with them. But it has been contended, that whatever might have been the rights of the occupying conqueror, as such, these were all terminated by the termination of the belligerent attitude of the parties, and that with the close of the contest, every institution which had been overthrown or suspended would be revived and re-established." "The fallacy of this pretension," the court proceed to say, "is exposed by the fact, that the conquered territory never was relinquished by the conqueror, nor restored to its original condition or allegiance, but was retained by the occupant until possession was matured into absolute, permanent dominion and sovereignty." The court then proceed to decide when the institutions of the provisional government would terminate. They say: "We conclude, therefore, that the ordinances and institutions of the provisional government could be revoked or modified by the United States alone, either by direct legislation on the part of congress, or that of the territorial government, in the exercise of powers delegated to it by congress." The question there presented was the validity of an ordinance of the territorial government, authorizing attachments of property of debtors, enacted by the provisional government, while the country was held in military occupation, and before the cession of it, but sought to be enforced by the provisional territorial court after the cession of the country to the United States, and after the military occupation had ceased. The court upheld the law in its origin, and also in its continuance in force, and the administration of it by the provisional territorial court after the cession of the country, and after the military occupation had ceased.

In the case of Jecker v. Montgomery, 14 How. [55 U. S.] 498, decided in 1854, the same supreme court of the United States incidentally recognise the legality and powers of those provisional courts, and while deciding that, for reasons peculiar to cases of prize, and not at all applicable to any others, they could not legally act in cases of that class, the court admit their powers and jurisdiction in other cases: making three decisions of the court of last resort of the government of the United States quite in point. Either of these should be sufficient authority for such a principle, if indeed a principle so plainly proper and necessary, can be thought to need authority of precedent at all. But at the risk of being tedious and doing work of supererogation, which charges I am persuaded might well be maintained against me, I will add to these authorities already commented on, still another one, which has a bearing quite material on this case at more than one point. I mean the case of U. S. v. Rice, 4 Wheat. [17 U. S.] 246. That case, as well as those already cited, decides that by the conquest and military occupation by one nation of a portion of the territory of another, the portion so acquired passes from the operation of the laws and government of the nation to which it had previously belonged, and comes under the laws and government of the nation making the conquest. It also decides that while such territory is held by the conqueror, it is the right of the party so holding it to govern it, and for that purpose to make laws by which to govern it. That while a portion of territory is so held, the laws of the conqueror holding are in force there, and the laws of the party from whom it has been taken are in abeyance not only de factor but also de jure; that while it is so held, the conqueror has de jure as well as de facto all the rights of dominion and sovereignty over it, and may exercise them at his pleasure, and that the former sovereign, overcome or expelled, has no right there, and his laws have no effect there; that acts done there with the authority of the conqueror are legal and proper, but those done in violation of his laws, even though done in obedience to the laws of the sovereign expelled, are not legal, but contrary to law. In short, that, by conquest, the sovereignty and right to rule of the conqueror are introduced and established, and the sovereignty and right of rule in the party expelled are extinguished; and that the duty of allegiance in the people remaining there is transferred in like manner from the vanquished to the victorious party; in fact, that by such an act the change of the sovereignty and allegiance are complete, and new rights and duties in both parties are created accordingly. I think that all these conclusions certainly follow from what is decided, if, indeed, they are not all actually decided there. That case, like each of the others cited, was decided by the supreme court of the United States—the court of highest human authority on that subject—and as the decision was against the United States, and in favor of the authority of Great Britain, its enemy in

the war, and was made shortly after the occurrence of the war out of which it grew; and while no department of this government was inclined to magnify the rights of Great Britain or disparage those of its own government, there can be no suspicion of bias in the mind of the court in favor of the conclusion at which it arrived, and no doubt that the law seemed to the court to warrant and demand such a decision. That case grew out of the war of 1812, between the United States and Great Britain. It appeared that in September, 1814, the British forces had taken the port of Castine, in the state of Maine, and held it in military occupation; and that while it was so held, foreign goods, by the laws of the United States subject to duty, had been introduced into that port without paying duties to the United States. At the close of the war the place was by treaty restored to the United States, and after that was done the government of the United States sought to recover from the persons so introducing goods there while in possession of the British, the duties to which by the laws of the United States, they would have been liable. The claim of the United States was that its laws were properly in force there, although the place was at the time held by the British forces in hostility to the United States, and the laws, therefore, could not at the time be enforced there; and that a court of the United States (the power of that government there having since been restored) was bound so to decide. But this illusion of the prosecuting officer there was dispelled by the court in the most summary manner. Mr. Justice Story, that great luminary of the American bench, being the organ of the court in delivering its opinion, said: "The single question is whether goods imported into Castine during its occupation by the enemy are liable to the duties imposed by the revenue laws upon goods imported into the United States. * * * We are all of opinion that the claim for duties cannot be sustained. * * * The sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors. By the surrender the inhabitants passed under a temporary allegiance of the British government, and were bound by such laws, and such only, as it chose to recognise and impose. From the nature of the case no other laws could be obligatory upon them. * * * Castine was therefore, during this period, as far as respected our revenue laws, to be deemed a foreign port, and goods imported into it by the inhabitants were subject to such duties only as the British government chose to require. Such goods were in no correct sense imported into the United States." The court then proceed to say, that the case is the same as if the port of Castine had been foreign territory, ceded by treaty to the United States, and the goods had been imported there previous to its cession. In this case they "say there would be no pretence to say that American duties could be demanded; and upon principles of public or municipal law, the cases are not distinguishable." They add at the conclusion of the opinion: "The authorities cited at the bar would, if there were any doubt, be decisive of the question. But we think it too clear to require any aid from authority." Does this case leave room for a doubt whether a country held as this was in armed belligerent occupation, is to be governed by him who holds it, and by him alone? Does it not so decide in terms as plain as can be stated? It is asserted by the supreme court of the United States with entire unanimity, the great and venerated Marshall presiding, and the erudite and accomplished Story delivering the opinion of the court, that such is the law, and it is so adjudged in this case. Nay, more: it is even adjudged that no other laws could be obligatory; that such a country, so held, is for the purpose of the application of the law of its former government to be deemed foreign territory, and that goods imported there (and by parity of reasoning other acts done there) are in no correct sense done within the territory of its former sovereign, the United States.

No part of the remarks of the court in this case is more fully warranted or proper than the last, to the effect that the case is too clear to require aid from authority. The right, therefore, of a conqueror in a conquered country to ordain a system of government for it, and among other institutions to erect courts of justice, and maintain them in the discharge of their proper functions, is as well established and free from doubt when considered on authority, as it is in principle; and about as well in each as any proposition which could find among men an advocate to question it, could in the nature of things be expected to be.

But it may be said that this reasoning, if correct as to territory foreign to the conqueror, and as to which his rights and duties are simply and solely those of a conqueror by force of arms, is not applicable to the case in question, for this Louisiana is a part of the territory of the United States, over which the powers and duties of the president and the other departments of the government were already fixed, and are dependent on the constitution and laws of the United States, and limited to the powers and duties conferred by them; and that those laws do not give the president the power to establish a court like this, and therefore that he has not that power. It is quite certain that ordinarily he would have no such power; and hence, instead of looking for it to the constitution and laws of the United States alone, I have looked elsewhere and to other facts than his merely occupying the place of president at

the time. I have invoked also the fact that he was by virtue of that office, as commander of the forces of the United States, holding in armed belligerent occupation the country in which the court was established, and in which its powers and authority are now brought in question. Is this country, for the purpose of determining the powers and duties of the commander-in-chief of the army and navy of the United States, to be deemed domestic, or is it to be deemed foreign territory? What are the relations of the forces of the United States, and of their commander, to these districts of country as they enter them, expelling the forces or the enemy? Is he the chief executive of the country of which these districts are a part, and is he nothing more; and are his powers and duties those of chief executive only? Has he in this country subjected to his arms, and while in armed belligerent occupation of it, with the forces under his command, has he by law the same powers and duties as he would have in Massachusetts or New York in time of profound peace, and has he no others? Has war given him no powers in law in addition to those possessed by him in time of peace? Having in war broken down the hostile power of it, and driven its forces out of it by the military force under his command, has he no new powers there by reason of that fact? When his subordinate officer, Admiral Farragut, landed there from the deck of the Hartford, did he carry with him no right to power not commonly enjoyed by the president in other territory of the United States? Did his rights as conqueror cease the moment his power in that character was established? Having entered Louisiana as commander-in-chief, at the head of his forces victorious, was he at once remitted to the position, powers, and duties of a peace president in times of peace, and limited to them? Had he none of the powers or duties of a conqueror in a country subjected to his arms? What was this country to do for a government when the old hostile one had been reduced and expelled? Was it to get along without one as best it could? Was it to do this until some new one could spring up to supply the want? Were all the rights of persons and property, natural and acquired, the right to life, security, liberty, and property, to be at once suspended, and was the rule of physical force to override them all? The right of a conqueror to govern a country held by him by right of conquest, is well established on authority. The cases which establish this right, however, relate to the conquest of a country foreign to the conqueror, and as to which he has no rights and is under no restraints, except those which come from the fact of conquest alone, and not to one which is of right a part of his own proper domain. In this case, the territory over which the government of the United States had acquired, as we have supposed, some rights in the nature of rights of con-quest, belonged of right to it as a part of its own domain, and it remains to be considered whether that fact makes any difference in respect to the right by the laws of war to govern a country conquered.

It may be said that the act of the United States in this case, had not the usual effect of a conquest of foreign territory; that instead of acquiring anew the rights of a conqueror, the United States by this conquest (as I for the sake of convenience have called it) has but removed the obstacles to the enjoyment of its pre-existing rights, and has not acquired any new ones of a conqueror. As we have seen, the foundation of the right of a conqueror to govern conquered territory, and for that purpose to establish provisionally civil institutions in it, is necessity, and that chiefly the necessity of the conquered country and its inhabitants. A government of some kind they must have, for no community can exist without it. The power of the conqueror has overridden and subjected all other power, and this necessity can be supplied from no other source than him, for he holds for the time being all power. Whilst this continues to be the case, what is there in the case in question of Louisiana which should make it different from a foreign country? The inhabitants of that country owed allegiance to, and were entitled to the protection of the government of the United States, it is said familiarly, and this is quite true in the sense in which the remark is usually made. But did the United States ever at any time. or under any circumstances, owe the people of this territory a protection and government which would supply all. or any considerable part of their wants in this respect? If the government of the United States should afford to this country all the protection and aid—should perform for it all the governmental offices, which it by virtue of the constitution and laws of the land was ever bound, or had a right to do, how far would this go towards supplying the wants of the country in that respect? Is it not quite certain, on looking into the law on the subject of the relations, rights, and duties of the federal government to the tract of country in question, or any other tract embraced within the state, that with the federal government in full function, and all its duties fully performed, a very small portion of the governmental necessities of the country would be supplied?

It is a fact familiar to us all, that under our system of government, almost all the governmental aid needed by our people is due to them from the local depositories of power, the state governments—for most purposes within their own territory sovereign. These governments, under our system, are the repositories of nearly all of the powers of government in ordinary times in familiar use among us, and whether they be applied by the state itself, by its own officers directly, or be allotted out in parcels to smaller gov-

ernmental districts, such as counties or parishes, cities, towns, or villages, to be applied by the officers of those localities respectively, still the state and not the federal government is the reservoir from which they are drawn, whether it be for distribution or exercise; and the state, and not the federal power and officers, administer and execute them. The man of commerce, the seaman, a traveller on the highway of nations, the soldier, whether at home or abroad, the direct instrument of the government, and at once its representative and defender, and the traveller in a foreign land, experience and realize the power and the protecting hand of the federal government, its value and beneficence; but in the ordinary walks of life, at home, among plain people, very few—probably not one in a hundred—have occasion in a lifetime to invoke or experience any office or effect, enabling or restraining, protective or punitory, of that government, whose duty relates in ordinary times and circumstances almost exclusively to the foreign relations of the country, happily almost always so secure and free from threatening aspect or cause of anxiety as to attract little or no consideration.

From which government comes the system of police by which order in society is maintained from one end of the land to the other? From which the judicial power—the one in question here and now—by which, in ordinary cases, crime is punished and repressed, controversies decided, and the rights of persons and property established and maintained? and what is certainly quite in point, from which source comes the power by which these very unfortunate criminals now before me would ordinarily on a basis of peace be tried, and justice be meted out to them? What law of the United States, as laid down in the constitution and statutes thereof, did Reiter violate, when (forsaken of his God) he took the life of his wife, the partner of his bosom, on that hopeful, holy morning of the anniversary of the birth of our Saviour, in the year of that event one thousand eight hundred and sixty-two? What law of the United States did Louis—poor benighted Louis — whose eyes have scarcely been blessed with the sight of himself free to seek his own security or happiness—violate, when he applied the fatal torch to the fated house, the residence of a human being? It is quite certain that the government of the United States, remitted to its ordinary constitutional functions within one of the states as in times of peace, could not supply a government at all adequate to the necessities of society, and especially could not have taken cognisance of, or punished at all, either of the offences in question by any tribunal it ever had or had the right to establish.

The necessity for a provisional government here, for nearly all the purposes for which a government is necessary, and especially of a provisional tribunal for dispensing justice generally, and in cases like these now under consideration, was the same as, and none other than it would have been if this tract of country in question had been a part of the domain of a government wholly foreign to that of the United States, and over the territory of which it had no other rights than those growing out of war and conquest. Indeed, it may well be doubted whether, in reference to governmental rights and duties in matters of this kind, there is any difference between the citizens of the several states and those of foreign territory. Certain it is from what has been said, that this territory is not, by the nature of our system of government, under the dominion of the federal government as to most matters of local administration, but is exclusively under the state and local government, and the federal government was never bound and never assumed or pretended to furnish government to any section of the states as to their internal or local matters generally, and has not, and never had the duty, right, or power to do so. But this district of territory had been in insurrection against the government of the United States, had openly withdrawn from all connection with that government under the forms of law and civil legislation, had allied itself with others hostile and at war with it, and had, by force of arms, for a considerable time maintained this attitude external and hostile, resisting successfully the efforts of the government to subject it to law and duty. However the act of secession was ineffectual in law, this district had in fact and practically withdrawn from all relations with the government of the United States, and had arrayed itself in armed hostility to it. Its duties remained unchanged no doubt, but its rights to the filial relation —its rights to receive from the federal government the consideration and care of a parent rather than the imperious commands of a military master, may have been much changed by the events which had transpired, and I think that they had been. Having taken for itself the attitude of a foreign state, and that too of one hostile and at war with the United States, and formed and adapted all its civil institutions, and in every respect bent itself to that condition, and claimed and asserted it, and practically maintained it by force of arms for a time, and having been at this time overcome and subjected to the arms of the government of the United States, it may very well be that while it has acquired no new rights by virtue of its pretensions, it has resigned and forfeited old ones, and is no longer entitled to demand the benefits of a relation it has renounced and repudiated, however it may have failed in establishing at that time its freedom from the duties attendant upon it.

The counsel for the prisoners Reiter and Louis, however, take different grounds on this motion. The former insists that the

whole structure of the court in its origin was without warrant in law. That inasmuch as the constitution and laws of the United States give no authority to the president to establish such a court, he has none, and that his act in attempting to establish it is ineffectual, from want of constitutional and legal power in him; while the learned counsel for the accused Louis concede that the president. as commander of the forces of the United States, had authority by the laws of war to establish it, and that it had originally all the powers by him attempted to be conferred, but insist that these powers have ceased, by reason, as I understand the argument, of the organization of a civil government here which supersedes the military. I pass to consider the question presented by this argument. If a conqueror in a conquered country have a right to set up a government in it, when does that right cease? Or, rather, if he have such a right, and exercises it, when does the power of the government so set up cease? I answer, first, it will terminate necessarily whenever the power which formed it shall terminate, or become unable to support it. And, secondly, whenever that power shall for any cause voluntarily bring it to an end. That the power of the federal government here has not been terminated, I need no argument to prove. It certainly has not been expelled, and it quite as certainly has not been withdrawn. It remains, we all feel and realize, the great, beneficent, paramount, and only power here; able ever to support and supporting itself, and furnishing and supporting every government office and function here. But on this point, as well as the one to which I have cited the cases above referred to, some of those cases speak as authorities. In two of those cases. at least, in which the power of the provisional government and the provisional courts was sustained by the supreme court of the United States, it was so upheld in territory belonging. aside from military occupation and of right to the domain of the United States, and over which that government had powers of government, full and complete, for all purposes, as any sovereign or state has ordinarily within its own territory; rights not limited to its external matters alone. or chiefly, as are those of the United States in territory lying within one of the states, but embracing powers for all the details of local administration, legislative, executive, and judicial. And even there, where the United States had by the constitution. powers of government ample for all purposes. the power to continue in force a provisional government long after military occupation had ceased, and when the rights of the United States there depended not at all on military power or belligerency, but wholly on compact between the former sovereign and itself—even there. in territory confessedly belonging to the United States, and in time of peace. and in the ab-

sence of military power or military necessity, the provisional government and the provisional courts were upheld to the fullest extent, and were adjudged to continue legally and practically in force as instruments of the federal government until it should, by its constitutional action, through its legislature, otherwise provide. In the earlier of those cases (Cross v. Harrison, 16 How. [57 U. S.] 164) the court say: "Our conclusion from what has been said is, that the civil government of California, organized as it was, from a right of conquest, did not cease or become defunct in consequence of the signature of the treaty or from its ratification. We think it was continued over a ceded conquest, without any violation of the constitution or laws of the United States, and that until congress legislated for it, the duties upon foreign goods, &c.. were legally demanded and lawfully received by Mr. Harrison, the collector of the port, who received his appointment, &c., from Governor Mason."

These cases, in deciding that a provisional government may be maintained by the military power of the United States in territory belonging to it, not held in military occupation, or jure belli, go far to prove that the fact that this country belonged, for some purposes, to the United States, aside from those coming from conquest and military occupation, did not take it from the application of the general principle that the conqueror in conquered territory, has the right to govern it and to establish government as he may deem expedient; but that such territory, on the contrary, is on the same footing in that respect as territory strictly and for all purposes foreign.

There is no pretence that the federal government has in any manner directly brought, or sought to bring, the labors of this court to a close. Having established it, and bade it proceed in the performance of its mission. it will continue (the power which established it continuing) until that power shall revoke its commission, or otherwise decree its discontinuance. But it is said that a civil government has been established here, and that therefore the proper functions of the provisional one, and among others, the functions of the provisional court, have ceased. It is quite true that some measures apparently tending to the establishment of a civil government have been taken. Members of congress were elected in 1862, and were admitted to seats in the national legislature. Several other officers—a governor, attorney-general, and others, have also been elected more recently under the direction of the military authorities. A convention for the revision of the constitution of the state has been elected and convened. These things look like measures for the organization of a state government, and measures of this kind pursued may in course of time lead to such a consummation, at the pleasure of the federal

government. That all these things have been done under and by virtue of the fostering care of the federal government, as exercised by the military arm of it, no one at all acquainted with the facts will doubt.

Waiving for the present, however, as unnecessary to be considered here, the question whether these movements have their foundation in and derive their vital principle from the state or from federal sources; and, whether in use, as some of them are, they are in fact instruments in the hands of the defunct state, or of the living federal power, it is quite certain and sufficient for present purposes, that the federal government has not voluntarily abdicated and resigned to them, all or generally, the functions of government, certainly not those of the provisional court. Such a general surrender alone could have divested the power of this court, for there is no pretence that the federal government has singled out certain powers, and among them the powers heretofore exercised by this court, and so parted with them as to be unable to recall or exercise them. The whole argument, on the contrary, proceeds on the idea that civil government as a whole, has been established here, and all the power to exercise it resigned into the hands of state authorities. In short that the state is again in possession of all the governmental powers which of right, under our system, belong to the state, in contradistinction to the federal government, and that the United States retain only what are designed under our system of government, ordinarily to be exercised by the federal government in all the states in times of peace, and that both parties are, in fact, remitted to their own positions in the constitutional government formerly occupied by them, and the same as are now occupied by the loyal states. At the time this motion was made (and everything must relate to that time) there was not a court in the part of Louisiana within the federal lines having any reasonable pretence of authority from any other source than the federal government. The United States district and circuit court, then in operation here, were and are the constitutional courts of that government. All else were creations of the military power of the federal government.

The learned argument of Mr. Lamont, the prosecuting attorney of this court, on that point, was entirely correct. All the governmental functions in exercise here at that time, not only courts of justice, but all others, and all the judges, officers, and instruments by which they were performed and operated, were those of the federal government, and were appointed, commissioned, animated, sustained, and moved by that power alone. The provisional court for the state of Louisiana—the court of the federal government—retains all the powers it ever had and will continue to exercise rightfully a jurisdiction commensurate with its charter, so long as the president or the government he represents, shall will it, and shall uphold it for that purpose; and whatever

other institutions may have been brought, or allowed to come into existence in the mean time, this court will not cease, or go out of existence, or be shorn of any of its powers or proportions by reason of the fact that some modicum of them or of other powers of civil government, have been allotted by the common parent—the federal government—to other institutions or instrumentalities.

Something was said on the argument about the laws which these courts should administer. The laws of the conquered country, like everything else connected with its government, are entirely under the control and subject to the will of the conqueror. He makes and adopts them in use at his pleasure. Those found in use at the time of the conquest may be continued in use by him or laid aside at his pleasure. If continued in use, however, they become his, and derive their force and efficacy from him and his adoption of them. In the cases cited above, a new code was made and introduced by General Kearney, representing the government of the conqueror, called the "Kearney Code." In the absence of any provision on the subject, in such a case courts of justice are not bound to adhere to any particular system. This court is commissioned to administer justice, and no code of laws is prescribed for it. It may adopt such rules as may seem wise and expedient, whether corresponding to the system in use here at the time of the conquest, or differing from it. It has always administered justice according to the Code of Louisiana, and so have all other courts here, not because it was bound by that Code, as law of the state, but because it seemed expedient and wise to continue along under the system found in use here, rather than introduce a new one. That system had had the sanction of the previous state government, and was no doubt suited to the occupations, habits, and wants of the people. The transactions which would become subjects of investigation had been entered into under and in reference to it as the system by which they would be construed and enforced. Moreover, it was already in use, and had better be continued in use and a change avoided, unless for some decided cause a change was deemed necessary. Having adopted that as the rule in the courts here it became law to them as well as to society here, and they were bound to adhere to it and administer justice according to it so long as it continued to be the rule. The courts here have always done that, and it is not probable that the laws of Louisiana have ever been more closely adhered to in the administration of justice here than they have been during the time of the government of the country by the federal authorities, since the occupation of it by their forces.

In the cases cited above from California (Cross v. Harrison, 16 How. [57 U. S.] 164; Leitensdorfer v. Webb, 20 How. [61 U. S.] 176; and Jecker v. Montgomery, 14 How. [55 U. S.] 498) the previously-existing systems of law were ignored and a new and original system introduced, which course received the

sanction of the supreme court of the United States in those cases; and in the case cited from Maine (U. S. v. Rice, 4 Wheat. [17 U. S.] 254) the British government made a new and different law and administered it while the territory was held by it, and that course received the sanction of the same court of highest authority, in the case referred to.

I have not cited authority for everything I have said in this opinion—perhaps not for every doctrine I have declared. I have, however, referred to the court of highest authority in such cases of any tribunal known among men, and to the decisions of that court, quite in point, for every principle and doctrine claimed in this opinion, which is not so plain and evident as to make reference to cases for authority unnecessary and inexpedient, and for the omission to cite them to such points, I have the very high authority of the supreme court of the United States, in the case of U. S. v. Rice, 4 Wheat. [17 U. S.] 254, above referred to, that in cases like that "too clear to require aid from authority," it is not well to encumber an opinion with them.

In addition to the cases already commented on, I will refer to several more having important bearing on this question, not as establishing any new principle or sustaining any old one not better sustained by more modern and unquestionable authority already referred to, though equally conclusive of the principle with them; but as furnishing, perchance, to some mind, some new view, reason, or illustration of a principle better established on authority by cases already introduced. Grotius De Jure B. ac. P. l. 2, c. ——, § 5 et seq.; Id. l. 3, c. 6, § 4; Id. c. 9, §§ 9, 14; Puff. Laws Nat. (by Barbeyrac) l. 7, c. 7, § 5; Id. l. 8, c. 11, § 8; Bynkershoek, Q. J., Pub. I. 1, cc. 6, 16; Duponceau's Transl., 46, 124; Voet ad Pandect, l. 39, tit. 4, note 7, De Vectigalibus; Id. l. 19, tit. 2, note 28; Id. l. 49, tit. 15, note 1; U. S. v. Hayward [Case No. 15,336]; The Fama, 5 C. Rob. Adm. 106; The Foltina, 1 Dod. 450; 30 Hogsheads of Sugar, 9 Cranch [13 U. S.] 191; Reeves, Shipp. 98 et seq.; U. S. v. Vowell, 5 Cranch [9 U. S.] 368; U. S. v. Arnold [Case No. 14,469], 9 Cranch [13 U. S.] 106; Empson v. Bathrust, Winch, 20, 50; Winch. Ent. 334, cited Poph. 176, Hut. 52; Com. Dig. "Officer," H.

My conclusions, therefore, are: That at the time of the establishment of the provisional court for Louisiana, a considerable part of the territory of that state was held by the forces of the United States, in armed belligerent occupation. That in a country so held, the authority of the occupying force is paramount, and necessarily operates the exclusion of all other independent authority in it. That government from some source is a necessity, and while the power to give and administer government is exclusively with a party occupying a country, there can be no doubt that the right and the duty are his to furnish a government and supply that want. That the actual military occupation of that territory by the United States has continued from that time to the present, and still continues, and the right and duty of government, therefore, continue with the United States. That the establishment of the provisional court for Louisiana, by the president, as commander-in-chief of the forces of the United States, while they held the territory in which it was to exercise its functions, was an act warranted by the law of nations. That so long as the authority of the United States shall continue, the right and the duty of it, as the party dominant there to afford to the country government will continue. That said court has, from the time of its foundation to the present time, rightfully exercised its functions in territory in which the government of the United States has been by force of its arms sovereign, and will continue rightfully to exercise them there, so long as its commission shall remain unrevoked, and the power of the United States shall continue to support it in the exercise of them.

NOTE. The counsel of libellants in the case of The Grapeshot [Case No. 5,703], referred to in the article on the authority of the provisional court (4 Am. Law Reg. [U. S.] 388), desire us to state that that case was transferred by written agreement of parties, and they believe that no case has occurred of a compulsory transfer of causes from the United States courts to the provisional court.